**ALUMINUM COMPANY OF AMERICA, a Pennsylvania corporation**

v.

**\*BEAZER EAST, INC., a Delaware corporation; Chicago Bridge & Iron Company, an Illinios corporation**

**Beazer East, Inc., a Delaware corporation, Appellant**

No. 96–3420.

United States Court of Appeals, Third Circuit.

Argued March 26, 1997.

Decided Sept. 2, 1997.

██

* Amended as per the Clerk's 8/14/96 Order.

Christopher J. McNevin (argued), William K. Dial, Pillsbury, Madison & Sutro, Los Angeles, CA, Debra B. Todd, Cathy R. Gordon, Todd & Silverberg, Pittsburgh, PA, for Appellant.

Richard W. Gladstone, II (argued), Joel L. Lennen, Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, for Appellee Aluminum Company of America.

Lloyd S. Guerci (argued), Gary A. Winters, Mayer, Brown & Platt, Washington, DC, Russell R. Eggert, Mayer, Brown & Platt,

Chicago, IL, and David G. Ries, Thorp, Reed & Armstrong, Pittsburgh, PA, for Appellee Chicago Bridge & Iron Company.

Before: SLOVITER, Chief Judge, STAPLETON and ALDISERT, Circuit Judges.

STAPLETON, Circuit Judge.

■ This appeal involves important questions about the final order requirement of 28 U.S.C. § 1291 and our appellate jurisdiction. We conclude that the district court's resolution of all claims other than those the parties agreed to submit to arbitration produced a final order because it resolved all that the parties chose to present to the court. Since we have jurisdiction, we must also address issues of "operator" and "owner" liability under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 et seq. We will affirm the judgment of the district court.

## I. THE FACTUAL AND PROCEDURAL CONTEXT

The facts giving rise to this dispute began in the years preceding 1934. At that time, appellees Aluminum Company of America ("Alcoa") and Chicago Bridge and Iron Company ("CBI") maintained business relationships with American Lumber and Treating Corporation ("ALT Corp.") and American Wood Impregnation Corporation ("AWIC"). ALT Corp. and AWIC were in the business of using and promoting Wolman Salts for the treatment and preservation of wood. Alcoa sold Wolman Salts to both ALT Corp. and AWIC. CBI constructed wood treatment facilities.

In August 1934, ALT Corp. and AWIC merged to form the American Lumber and Treating Company ("ALT"). Alcoa and CBI were heavily involved in recommending and implementing the merger, and both immediately became large shareholders of the new company. Each simultaneously purchased 27.5% of ALT's authorized shares. ALT's third principal shareholder, Galena Corpora-

tion, granted Alcoa and CBI, jointly, a proxy enabling Alcoa and CBI to each appoint two directors to ALT's seven-member board of directors.

Between 1934 and 1954, ALT operated eighteen wood treatment plants around the country. Throughout this period, Alcoa and CBI continued to provide ALT withproducts and services. Both also increased their holdings in ALT stock, so that by 1954 they together held 95% of ALT's outstanding shares. Each year Alcoa and CBI elected a total of four of ALT's seven board members.

In April 1954, Alcoa, CBI, and appellant Beazer East, Inc. ("Beazer")[1] entered into a purchase agreement whereby Alcoa and CBI agreed to transfer to Beazer all of their ALT stock in exchange for newly-issued Beazer stock. Two months after execution of the purchase agreement, in June 1954, ALT and Beazer executed a liquidation agreement. Under the terms of the liquidation agreement, Beazer received immediate transfer and assignment of all of ALT's rights, titles, property, and assets. Beazer also assumed ALT's liabilities: Beazer "for itself, its successors and assigns, fully intending to become legally bound thereby, does hereby assume all of the liabilities and obligations of [ALT] of whatsoever nature." A5158. All of ALT's capital stock was redeemed and canceled and ALT was soon dissolved.

Years later, environmental damage was discovered at numerous sites where ALT had operated wood treatment plants between 1934 and 1954. CBI and Beazer each incurred costs in cleaning up these sites. In 1990, Beazer notified Alcoa that it considered Alcoa a potentially responsible party for the costs Beazer was incurring at the ALT sites, that Beazer expected Alcoa to assist in the cleanup, and that, if Alcoa refused, then Beazer would take legal action seeking contribution and indemnification from Alcoa.

Alcoa initiated this litigation in 1991. It sought a declaratory judgment, pursuant to sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, finding that Alcoa was not

1. Until 1989, Beazer was known as Koppers. We will use "Beazer" to refer to both Koppers and Beazer.

an "operator" of ALT's facilities between 1934 and 1954 and, therefore, is not liable for response costs at the former ALT sites. Beazer counterclaimed against Alcoa and added CBI to the action. Beazer sought a declaratory judgment that Alcoa and CBI are liable as operators and sought to recover from Alcoa and CBI for monies Beazer had expended on clean-up of the sites.[2] CBI then filed its own claims against Beazer, seeking declaratory judgments that it was not liable as an operator, that Beazer was liable as ALT's successor, and that a prior settlement between Beazer and CBI concerning CERCLA liability at some of the sites involved in this litigation ("1986 settlement agreement") is valid and binding. CBI also sought to recover from Beazer, under CERCLA and as a matter of equitable indemnity, for clean-up costs it had incurred at some of the ALT sites. Finally, Alcoa and CBI cross-claimed against one another for indemnification and contribution, in the event the court found them liable as operators of ALT's wood treatment plants.

On March 23, 1992, CBI and Beazer entered into a stipulation order requiring Beazer to comply with the 1986 settlement agreement. Under the district court's order, "[CBI] and Beazer expressly stipulate and agree that the [1986 settlement agreement is] valid and legally enforceable." A311. CBI and Beazer also "affirm that they shall comply with all of the terms of the Settlement Agreement...." *Id.*

Under a pretrial order entered by the court on March 13, 1996, the parties agreed that the trial would only concern issues of liability. They agreed that all non-liability issues, including determination of how much money any of the parties were entitled to collect from one another, would not be resolved by the court but would instead be settled in private arbitration or mediation. The court's consent order states:

> Following the trial on liability, this Court shall enter a final judgment. Subject to the parties' agreement, any issues

remaining after the liability trial, i.e., allocation or apportionment of any liability and amount of any response costs and/or damages, shall be referred to a private binding mediation/arbitration process, to occur following entry of final judgment on the liability issues and full and final resolution of any and all appeals following final disposition as to liability by this Court.

A316.

A bench trial was held in March and April of 1996. The district court issued a memorandum opinion and order on June 27, 1996, concluding that Alcoa and CBI were not liable for contribution as "operators" of the ALT plants and that Beazer was liable for response costs as ALT's successor. The court further ordered that Alcoa and CBI's cross-claims for indemnification were dismissed as moot and directed that the clerk mark the case closed.

CBI moved to amend the judgment, arguing that the district court's June order might not be a final judgment because damages issues remained to be resolved through arbitration. CBI asked the court to certify, pursuant to Federal Rule of Civil Procedure 54(b), that there was no just reason for delaying entry of a final judgment. It also sought a ruling in its favor on its claim concerning the validity of the 1986 settlement agreement between CBI and Beazer.

Subsequently, on July 22, 1996, the district court amended its earlier memorandum and order to correct two typographical errors. The court also stated: "With respect to CBI's request that the court amend the judgment order to reflect that the September 30, 1986 settlement between CBI and Beazer is binding and enforceable, the record shows that this issue was addressed and resolved ... by order of court dated March 23, 1992." The court did not address CBI's concern about the possible lack of a final judgment or its Rule 54(b) request.

---

**2.** Beazer's claims are asserted under CERCLA and under statutes of Massachusetts, Mass. Gen. Laws ch. 21E, § 5 (1994), and Oregon, Or.Rev. Stat. § 465.255 (1994). Both of these state statutes are construed with reference to federal deci-

sions interpreting CERCLA, so the parties agree that the state law claims should be resolved in the same manner as the CERCLA claims. Our references to "CERCLA" should be understood to encompass Beazer's state law claims as well.

After Beazer filed this appeal, CBI moved to dismiss the appeal for lack of appellate jurisdiction. Both the appeal and the motion to dismiss are before us.[3]

## II. JURISDICTION

The parties all agree that the district court had jurisdiction over this case pursuant to 42 U.S.C. § 9613(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1367. There is a dispute, however, as to whether we have jurisdiction to hear this appeal. Our jurisdiction, if we have it, is based on 28 U.S.C. § 1291, which gives courts of appeals jurisdiction over "appeals from all final decisions of the district courts."[4] CBI contends that the district court never entered a final order, and thus it has moved to dismiss this appeal as premature. Whether we have jurisdiction turns on whether there is a "final decision" of the district court within the meaning of § 1291.

### A. General Rules of Finality

■ "Whether an order is 'final' depends on its effect." *Marcus v. Township of Abington,* 38 F.3d 1367, 1370 (3d Cir.1994). Ordinarily, a final decision will have two effects. First, the decision will fully resolve all claims presented to the district court. Second, after the decision has been issued, there will be nothing further for the district court to do. *See Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911 (1945) ("A 'final decision' generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."); *Isidor Paiewonsky Assocs., Inc. v. Sharp Properties, Inc.,* 998 F.2d 145, 150 (3d Cir.1993) ("A final decision is one which disposes of the whole subject, gives all the relief that was contemplated, provides with reasonable completeness, for giving effect to the judgment and leaves nothing to be done in the cause save to superintend, ministerially, the execution of the decree.") (emphasis and internal quotation marks omitted).

■ The necessary complement is, of course, that there is no final order if claims remain unresolved and their resolution is to occur in the district court. *See, e.g., Marcus,* 38 F.3d at 1367 (holding that district court order staying § 1983 action pending outcome of state criminal proceeding against plaintiffs only delayed and did not terminate federal litigation and is not final order); *Newburgh Moire Co. v. Superior Moire Co.,* 218 F.2d 580 (3d Cir.1955). This is equally true whether the unresolved claim was asserted in the plaintiff's complaint, *see Marcus,* 38 F.3d at 1367, or was pleaded as a counterclaim, *see TMA Fund, Inc. v. Biever,* 520 F.2d 639, 641 (3d Cir.1975), or a cross-claim, *see Aetna Ins. Co. v. Newton,* 398 F.2d 729, 733 (3d Cir. 1968).

■ However, to determine the effect of a district court's decision—and therefore to determine whether there is a final order—it is sometimes necessary to look beyond the pleadings. A final order is not absent just because the district court failed to adjudicate all of the claims that were at one time pleaded. Instead, an appellate court must determine whether, at the time it is examining its jurisdiction, there remain unresolved issues to be adjudicated in the district court. Even if the appeals court would have lacked jurisdiction at the time an appeal was filed, the court has jurisdiction if, as a result of subsequent events, there are no longer any claims left to be resolved by the district court. *See, e.g., Bethel v. McAllister Bros., Inc.,* 81 F.3d 376, 382 (3d Cir.1996) ("[A]n otherwise nonappealable order may become final for the purposes of appeal where a [party] voluntarily and finally abandons the other claims in the litigation.").

### B. The Parties' Claims and Their Treatment in the District Court

Beazer, Alcoa, and CBI pleaded a dozen claims against one another.[5] The litigation

---

**3.** We exercise plenary review over the district court's decisions of law, *see SmithKline Beecham Corp. v. Rohm and Haas Co.,* 89 F.3d 154, 158 (3d Cir.1996), but review its application of the correct legal standard to the facts for clear error only, *see Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1222 (3d Cir.1993).

**4.** The parties do not suggest an alternative basis for our jurisdiction, and we find none.

**5.** This number does not count the claims asserted under the Oregon and Massachusetts statutes as separate claims, since in substance they are the same as the claims asserted under CERCLA.

began with (1) Alcoa's declaratory judgment claim against Beazer to declare Alcoa not liable as an operator. Beazer answered and added to the case (2) a declaratory judgment counterclaim against Alcoa to declare Alcoa liable as an operator and (3) a claim against CBI to declare CBI liable as an operator. Beazer also sought contribution and cost recovery against (4) Alcoa and (5) CBI for clean-up costs Beazer has incurred. (6) CBI's declaratory judgment counterclaim against Beazer asks for declarations that CBI is not liable as an operator and that Beazer is liable as ALT's successor. CBI also sought (7) cost recovery and (8) contribution from Beazer under CERCLA, (9) equitable indemnity from Beazer for CBI's response costs, and (10) a declaratory judgment that the 1986 settlement agreement between Beazer and CBI is valid and enforceable. Finally, (11) Alcoa cross-claimed against CBI for contribution and indemnification, should Alcoa be found liable, and (12) CBI cross-claimed against Alcoa for contribution and indemnification, in the event that CBI is found liable.

The first six of these claims were clearly and finally disposed of by the district court's judgment. The court's ruling granted Alcoa's declaratory judgment claim (1) and rejected those of Beazer (2 & 3). Since Alcoa and CBI were found not to be liable, Beazer could not prevail on its claims for contribution and cost recovery (4 & 5), and those claims became moot. The court granted CBI the declaratory judgment it sought (6).

The last three claims asserted by the parties were also resolved by the district court. CBI's counterclaim for a declaration regarding the validity of the 1986 settlement agreement between itself and Beazer (10) was resolved by the court's March 23, 1992 order entering Beazer's stipulation that the agreement was "valid and legally enforceable." A311.[6] Alcoa and CBI's cross-claims for contribution (11 & 12) were dismissed as moot since neither of these parties were found liable.

This leaves just three claims: CBI's claims for cost recovery, contribution, and equitable indemnity from Beazer (7, 8 & 9). Since the district court never reached the issue of how much money CBI is entitled to collect from Beazer, these claims were obviously not resolved on the merits. None of the parties contends otherwise.

■■■ Beazer argues, however, that these claims were resolved, in that they were dismissed from the case by the March 1996 consent order. Beazer characterizes that order as dismissing all claims other than the parties' declaratory judgment claims. If we could read the consent order in the manner Beazer proposes, it would be easy to conclude that we have jurisdiction. A district court judgment granting or denying declaratory judgments in an action seeking only declaratory relief is a final order even though further remedial action may be requested in a subsequent proceeding. *See Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742, 96 S.Ct. 1202, 1205–06, 47 L.Ed.2d 435 (1976); *St. Louis, I.M. & S. Ry. Co. v. Southern Express Co.*, 108 U.S. 24, 28–29, 2 S.Ct. 6, 8, 27 L.Ed. 638 (1883). The district court's "Judgment" clearly constitutes a final adjudication of all of the declaratory judgment

---

**6.** CBI first stated its claim for a declaratory judgment that the 1986 settlement agreement was valid and binding in its 1991 answer and counterclaim against Beazer. *See* A132. CBI alleged that it had become subject to claims covered by this agreement but that, in response to its demands thereunder, Beazer had taken the position that the agreement was null and void as contrary to public policy. CBI moved for partial summary judgment on its declaratory judgment claim regarding the agreement. Before the motion was acted upon, Beazer stipulated that the agreement was "valid and legally enforceable" and the court "so ordered" on March 23, 1992. A310–12.

In 'an' amended and supplemental pleading filed in 1993, CBI restated its claims against Beazer. It included among them a claim for a declaratory judgment that the 1986 settlement agreement is valid and binding. After the court entered its final judgment on June 27, 1996, CBI moved to amend that document to include a ruling on this claim. The district court determined that it was unnecessary to amend the final judgment because CBI's declaratory judgment claim had been "addressed and resolved" by the court's March 23, 1992 order. We agree. We perceive nothing that the district court could have said in its final judgment that would have added anything of legal significance to its order of March 23, 1992.

claims contained in the pleadings. Hence, if, after the consent order, the parties' claims consisted of only declaratory judgment claims, the district court's resolution of these claims would constitute a final order.

But we do not agree with Beazer's interpretation of the consent order. The order does not speak in terms of dismissing claims. Instead, it refers to "issues," specifying which issues will be tried before the court and which will be resolved in a non-judicial setting. Under the consent order, the only issues to be adjudicated by the court are the liability issues under sections 107(a) and 113(f) of CERCLA and the comparable sections of the Oregon and Massachusetts statutes. The consent order sets these issues for a bench trial to be followed by entry of "a final judgment." The order also directs that "any issues remaining after the liability trial, i.e., allocation or apportionment of any liability and amount of any response costs and/or damages, shall be referred to a private binding mediation/arbitration process, to occur following entry of final judgment on the liability issues and full and final resolution of any and all appeals." A316. Thus, the consent order delineates how *issues* will be resolved; it does not, as Beazer contends, dismiss any *claims*.

Although the consent order only expressly refers to issues, it nonetheless has the effect of determining where and when the parties' *claims* will be decided. Some of the claims seek nothing more than a determination of liability. Specifically, the declaratory judgment claims consist solely and entirely of requests for declarations of liability or nonliability. By mandating that all liability issues are to be resolved in the bench trial, the consent order has the effect of mandating that the declaratory judgment claims will be resolved at that trial. Other claims, however, consist of more than a liability determination. In particular, resolution of CBI's claims for cost recovery, contribution, and equitable indemnity requires a determination of liability as well as a calculation of a dollar figure CBI is entitled to recover from Beazer. A claim cannot be resolved unless all of the issues of which it is comprised are resolved. Thus, a consequence of the consent

order's provision that nonliability issues will be resolved in arbitration/mediation after appeals on liability are exhausted is that CBI's monetary relief claims will not be resolved until that nonjudicial proceeding occurs.

Claims 7, 8 and 9, therefore, remain unresolved. Unlike most unresolved claims, however, these claims will never be resolved in the district court. By the terms of the consent order, every issue that was left unresolved after trial has been removed from the court and referred to arbitration/mediation. The consent order guarantees that there will be no further proceedings before the district court in this action.

This case comes to us, then, in an unusual posture. The combined effect of the consent order and the liability trial is to leave three pleaded claims unresolved (7, 8 & 9) but to ensure that no further proceedings will occur in the district court as part of this action. Our task is to determine whether this combination of effects constitutes a final decision.

### C. The District Court's Decision is a Final Decision

■ The question presented is whether an order of a district court is a final, appealable order within the meaning of 28 U.S.C. § 1291 where (1) it finally resolves all issues which any party before it wishes it to resolve, (2) it complies with the Rule 58 requirements for entry of judgment, *see* Fed.R.Civ.P. 58, and is clearly intended by the court to be its final act in the proceeding, but (3) it leaves other issues relevant to the controversy—and, therefore, certain of the parties' claims—still to be resolved through a separate arbitration or mediation process agreed to by the parties. We conclude that such an order is a final, appealable order under § 1291.

We start with the proposition that parties in our system of litigation are generally permitted to determine what will be adjudicated by the court. A party which believes itself to have been wronged has no obligation to seek to effectuate its rights in a court of law. Even if it chooses to file a judicial action, the party is free to present to the court fewer than all of the claims it might be able to assert. The freedom to structure the litigation extends to still another level of detail:

the parties may agree to stipulate to certain facts or issues, thereby removing resolution of those matters from the purview of the court.

Courts are by design reactive institutions; they can resolve only what those who come to them present for resolution. It is entirely consistent with the role of courts in our governing system to allow parties broad freedom to structure the scope of litigation. Of course, some limits need to be placed on this freedom, primarily to ensure that parties do not exhaust judicial resources by repetitively pressing the same action on multiple occasions. Our doctrines of res judicata and collateral estoppel, as well as provisions of the Federal Rules of Civil Procedure (on, e.g., joinder and counterclaims), serve this purpose. Subject to those constraints, however, it is a fundamental principle of our federal civil justice system that the decision about what a court will adjudicate is made by the parties to the litigation. We see no reason why this principle should not extend to decisions to remove issues that were once pleaded and to refer them to resolution by a private, nonjudicial body.

 To a great extent, parties' freedom to structure litigation as they choose encompasses the decision whether to seek coercive relief or whether to seek only declarations of legal rights. A party in the position of Alcoa, Beazer, or CBI can bring a declaratory judgment action in which it unilaterally asks the court to adjudicate only the liability issues relevant to a particular claim. Although a court has discretion to decline to adjudicate a declaratory judgment action over which it has jurisdiction, a court should only exercise such discretion if it determines that issuing a declaratory judgment would serve no useful purpose. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 287–88, 115 S.Ct. 2137, 2142–43, 132 L.Ed.2d 214 (1995); *see also United States v. Commonwealth of Pennsylvania*, 923 F.2d 1071 (3d Cir.1991); Edwin Borchard, *Declaratory Judgments* 313 (2d ed.1941). The parties have the prerogative to seek only a declaratory judgment even though the party pressing such a claim

could have, at the time of filing, asked for coercive relief in the form of a damage judgment or injunction. *See* Borchard, *supra* at 315–16. Moreover, this prerogative exists even though it is contemplated that the party who is tendering only liability issues may subsequently elect to seek the assistance of a court in a proceeding for coercive relief.

While, as we have said, we do not agree with Beazer that the consent order dismissed all but declaratory judgment claims and rendered this a case actually involving only claims for declaratory judgments, we conclude that following entry of the consent order this case was the functional equivalent of one seeking nothing but declaratory judgments. After March 1996, all the parties were seeking, and all they could thereafter seek as part of this action, were declarations of liability. If the parties had known at the outset that all they desired from the court were such liability determinations, they could have brought this action as purely a declaratory judgment action. Since parties retain freedom to structure litigation even after it has begun, they were free to decide in the consent order—and the court was free to agree—to transform this into effectively a declaratory judgment case.[7] To decide otherwise would undermine the principle that it is for parties to determine what to put before the court.

 Since it is for parties to define the scope of an action, our determination of whether an action is complete must depend on whether the district court did all that the parties asked of it. Where the effect of a district court decision is to accomplish all that the parties asked the court to accomplish, and where the parties agree there cannot be—and, by court order, there will not be—any further proceedings in the district court as part of the same action, the district court's decision must be considered final for purposes of § 1291. In these circumstances, it is immaterial that there may remain unresolved claims that the parties had previously intended the court to resolve.

7. We believe the trial court has the same kind of discretion in this context that it possesses in determining whether or not to entertain a claim for a declaratory judgment.

An order of the district court that adjudicates all the court was asked to adjudicate is a final order even if another action regarding the same controversy may occur before the same or another court. Hence, as we have already noted, an action seeking solely declaratory relief is final when that relief is either granted or denied, even though the plaintiff may find it necessary to bring a subsequent action to enforce the judgment. Similarly, when a plaintiff brings a suit solely for the purpose of enforcing an agreement to arbitrate, an order requiring arbitration is a final order under § 1291 even though the merits of the underlying controversy will be determined in a separate arbitration proceeding, and though, following arbitration, the parties may return to a court in a separate judicial proceeding to enforce or vacate the award. *See, e.g., Zosky v. Boyer,* 856 F.2d 554 (3d Cir.1988). The subsequent judicial proceedings to enforce, confirm, or vacate an arbitration award are regarded as distinct matters, and the possibility of their occurrence does not deprive the district court's order in the original proceeding of its finality.

Our conclusion that we are dealing here with a final order is consistent with the policy rationales underlying the final order rule: minimizing the possibility of piecemeal appeals, according due deference to trial court judges, and promoting the conservation of judicial resources. *See Bader v. Atlantic Int'l, Ltd.,* 986 F.2d 912, 914 n. 5 (5th Cir. 1993). While there is a possibility that one of the parties will file a new judicial proceeding to enforce an arbitration award and, accordingly, some chance of a second appellate proceeding dealing with the same overall controversy, there is no greater potential for piecemeal appellate litigation here than in situations we have discussed involving suits solely for declaratory relief or to enforce an agreement to arbitrate.

Nor does hearing this appeal now "meddle" in any way with the authority of the district court. "The requirement of finality precludes consideration of decisions that are subject to revision," *Behrens v. Pelletier,* — U.S. ——, ——, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996), but here nothing in the district court's disposition is subject to revision by that court. The district court has entered a "final judgment" in accordance with its consent decree adjudicating every issue there designated for judicial resolution, and it clearly believed that no unresolved or tentatively resolved issues remained before it.[8]

With respect to judicial efficiency, we would expect our holding to reduce the demand on our scarce judicial resources. Our holding will produce this result by giving litigants who so choose the option of securing a final, appellate judicial resolution of their legal duties without our insisting on any prior resolution of remedial issues. As long as we are assured that the case cannot come back to the court for a resolution of the remedial issues—as we are assured here by the consent order—the judicial resources that would have been expended in resolving these issues can be devoted to other matters.

Relatedly, we also believe our holding is consistent with the national policy favoring arbitration. Where all parties to a controversy in litigation are prepared to limit the issues for judicial resolution and to commit the remaining issues to binding arbitration after the issues for judicial resolution have been finally resolved, permitting them to pursue such a course will clearly serve that national policy.[9]

In reaching our conclusion, we are mindful of a facially similar but distinguishable situa-

---

8. We expect this explains why the district court did not grant CBI's motion to certify this appeal pursuant to Fed.R.Civ.P. 54(b). The district court believed (and we agree) that there were no unresolved claims pending before it for resolution. While unresolved claims existed, there were no unresolved claims before it that required further district court proceedings. For this reason, Rule 54(b) certification was unnecessary to allow this appeal.

9. Congress recently reaffirmed its strong commitment to promotion of arbitration by amending the Federal Arbitration Act, 9 U.S.C. § 16, to provide for immediate appellate review of interlocutory orders, and not just final orders, that favor litigation over arbitration. *See Ballay v. Legg Mason Wood Walker, Inc.,* 878 F.2d 729, 732 (3d Cir.1989).

tion in which we have found there to be no final order. In *Zosky v. Boyer,* we adhered to our consistent view that an order granting or denying a motion to compel arbitration is a final decision only if such an order was the full relief the parties sought. 856 F.2d at 557–60. Thus, in *Zosky,* there was no final order when the court granted the defendants' motion to compel arbitration, which they had filed in response to the plaintiff's claims for coercive relief. This situation is distinguishable from the one we deal with here because in a case like *Zosky* at least one party is still seeking judicial resolution of an unresolved claim. By contrast, in this case all parties agreed by the consent order that there can be no further judicial proceedings to adjudicate the unresolved claims. Whereas here the district court has done all that all of the parties have asked, in *Zosky* and similar cases some party is still asking the court to decide the merits of claims rather than direct them to arbitration. In such a situation, the court has not adjudicated all claims a party wishes adjudicated and the proceeding necessarily remains open until an order is entered finally terminating or enforcing the remaining claims.

In *Zosky* we also commented on the relationship between the appealability of arbitration orders and the promotion of arbitration. As we said there, "Allowing interlocutory appeals of [orders favoring arbitration] would defeat the attractiveness of arbitration by imposing delay and additional expense." 856 F.2d at 561. The disincentive to arbitration that we noted in *Zosky* is not present here. A sophisticated party contemplating entering a binding arbitration agreement may well be deterred by the knowledge that another party attempting to escape the agreement once a dispute has arisen can delay its final resolution through arbitration by instituting expensive and time-consuming appellate proceedings over the duty to arbitrate. That party will not be similarly deterred, however, by the knowledge that in a situation involving no prelitigation agreement to arbitrate the parties, by unanimous agreement and consent of the court, can secure a final judicial resolution of the liability issues that separate them and thereafter resort to arbitration. As we have noted, our holding, far from posing a disincentive to arbitration agreements, provides an additional setting in which the advantages of arbitration can be realized.

In concluding as we have, we have carefully considered the decision of the Court of Appeals for the Fifth Circuit in *Way v. Reliance Ins. Co.,* 815 F.2d 1033 (5th Cir.1987). We agree with CBI that there is no material distinction between the situation presented there and the one we here confront. We reach a different result because we respectfully disagree with the reasoning of the *Way* court.

In sum, we hold that when a district court has resolved—in a final order entered pursuant to Fed.R.Civ.P. 58—all the issues the parties have presented to it for adjudication, and the parties have agreed to entry of an order guaranteeing that no further proceedings will occur as part of the same action in the district court, then there is a final decision for purposes of § 1291. The presence of previously pleaded but unresolved claims, to be resolved at some future date in a nonjudicial setting, does not deprive the district court's judgment of finality. Therefore, we have jurisdiction to hear this appeal.

III. *LIABILITY OF ALCOA AND CBI AS "OPERATORS" OF THE ALT FACILITIES*

Under CERCLA, four types of "covered persons" are held jointly and severally liable as "responsible parties" for the costs of cleaning up hazardous waste sites: (1) owners and operators of vessels or facilities; (2) persons who at the time of disposal of hazardous substances owned or operated a facility where such substances were disposed of; (3) generators of hazardous substances or any person who arranges for their disposal or treatment; and (4) transporters of waste, if they participate in the selection of the disposal site or facility. 42 U.S.C. § 9607(a)(1) to (4). A non-covered party that incurs clean-up costs can bring a cost recovery action against any responsible party. *Id.; see generally Redwing Carriers, Inc. v. Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996). Responsible parties, while jointly and severally liable for any clean-up

costs, may maintain a contribution action against other responsible parties. 42 U.S.C. § 9613(f)(1)."In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.*

We must determine whether the district court was correct in finding that Alcoa and CBI are not liable as"operators" of ALT's wood treatment plants. A corporation may be held liable as an "operator" of facilities owned by another corporation only if the "actual control" standard is satisfied. *See Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209 (3d Cir.1993). As we explained in *Lansford–Coaldale:*

> Under the actual control standard, a corporation will only be held liable for the environmental violations of another corporation when there is evidence of substantial control exercised by one corporation over the activities of the other....
>
> ... [W]hile the longstanding rule of limited liability in the corporate context remains the background norm, a corporation cannot hide behind the corporate form to escape liability in those instances in which it played an active role in the management of a corporation responsible for environmental wrongdoing.
>
> ... Whereas a corporation's "mere oversight" of the ... sister corporation's business in a "manner appropriate and consistent with the investment relationship" does not ordinarily result in operator liability, a corporation's "actual participation and control" over the other corporation's decision-making does.
>
> The determination of whether a corporation has exerted sufficient control to warrant imposition of operator liability requires an inherently fact-sensitive inquiry, involving consideration of the totality of the circumstances presented. The factors courts should consider focus on the extent of the corporation's involvement in the other corporation's day-to-day operations and its policy-making decisions.

*Id.* at 1221–22 (citations omitted); *see also FMC Corp. v. U.S. Dep't of Commerce,* 29 F.3d 833, 843 (3d Cir.1994) (en banc) ("[A] corporation will be liable for the environmental violations of another corporation if there is evidence that it exercised substantial control over the other corporation.") (internal quotation marks omitted). *Lansford–Coaldale* explicitly rejected an alternative test that some courts have adopted: the authority-to-control test, which imposes liability as long as one corporation had the capability of controlling the other, even if the former corporation never chose to exercise its authority. 4 F.3d at 1221.

After a bench trial, the district court concluded that the evidence did not show actual and substantial participation by Alcoa and CBI in ALT's day-to-day wood treatment operations or in its policy-making decisions. The court therefore rejected Beazer's claims that Alcoa and CBI were operators of ALT's plants. We will affirm.

As the district court explained, the essence of Beazer's theory is that Alcoa and CBI controlled ALT's board, ALT's board controlled ALT's officers, and the officers controlled the employees. Hence, Alcoa and CBI allegedly "controlled" ALT's operations indirectly via manipulation of ALT's board. *See* slip op. at 25–26. The facts found by the district court, however, establish that ALT, from 1934 to 1954, was a self-sufficient entity which managed its own operations and made policy decisions independent of Alcoa and CBI. The facts also show that any involvement by Alcoa and CBI in ALT's affairs was wholly consistent with prudent investor oversight.

For example, the district court found that the eighteen wood treatment plants ALT operated between 1934 and 1954 were each managed by a plant superintendent employed only by ALT. Each plant superintendent made the day-to-day operating decisions for the facility. Each reported to ALT's operations manager in Chicago, who was employed full-time by ALT and held no position with either Alcoa or CBI. The decisions of the plant superintendents and operations managers of ALT during these twenty years were neither determined nor influenced by any officer or employee of Alcoa or CBI.

Throughout this period, ALT had corporate departments responsible for operations,

accounting services, technical support, sales promotion, advertising, and direct sales. Each department was run by a department head who reported directly to the president of ALT. Each department head was a full-time employee of ALT, and only ALT, and his or her decisions were made free from dictation or suasion by Alcoa or CBI.

From 1934 to 1954, there were three presidents of ALT. When serving as ALT president, each of these three was a full-time employee of ALT and was not an employee or officer of either Alcoa or CBI. An officer and director of CBI did simultaneously serve as vice-president and treasurer of ALT, but this, alone, does not establish CBI involvement in ALT management decisionmaking. As the district court found, there was no "credible evidence indicating that either Alcoa or CBI dictated a single management decision over the twenty-year period to any of ALT's presidents." *Id.* at 23.

Alcoa sold Wolman Salts to ALT and CBI sold it steel and other construction products. Both also provided ALT audit services and served as guarantors on three bank loans ALT acquired after 1947. None of these are indicative of exercising control, since the credible evidence shows that ALT paid fair market value for the goods and services it received and repaid the loans from its own operating funds. Moreover, these facts are consistent with Alcoa's and CBI's roles as major investors in ALT.

From 1934 to 1954, ALT's Board of Directors had seven members. Throughout this period, by virtue of its stock ownership and the Galena proxy, Alcoa and CBI each elected two nominees to the ALT board. These nominees were either executives or former executives of Alcoa or CBI. ALT's board met four times a year during this period and performed the functions typically performed by boards of directors: it "oversaw the management of the corporation's assets and liabilities; established and approved the corporation's mission, strategy, and tactics; reviewed management's actions in light of financial performance; and hired and fired top management.... The board did not dictate or otherwise become involved in ALT's day-to-day management, its plant operations, or in any waste management practices." *Id.* at 11.

The district court found that there was no "credible evidence that the Alcoa and CBI 'representatives' who served on the ALT board made any decision that was dictated by Alcoa or CBI or otherwise exhibited divided loyalty when attending to ALT business." *Id.* at 28. Indeed, in the only three instances in which there is record evidence of a chief executive of these stockholders taking a position on an issue before the ALT board, the ALT board made a decision contrary to the chief executive's recommendation.

Beazer does not challenge these factual findings before us as clearly erroneous. We conclude that these facts are sufficient to defeat Beazer's argument that Alcoa and CBI exercised actual and substantial control over ALT's operations.

 It must be remembered that the actual control test was devised to give content to the word "operator" in § 9607(a) and thereby to carry out Congress' "intent to hold a corporation liable for the environmental violations of its subsidiaries and sister corporations, if it is otherwise determined to have operated the facility in question." *Lansford–Coaldale*, 4 F.3d at 1221 n. 11. Accordingly, a corporation cannot be held liable for CERCLA violations at a facility under the actual control test unless it is found to have either made the day-to-day operating decisions concerning the facility or exercised "pervasive control" over its policymaking. Here, Beazer has shown nothing more than that Alcoa and CBI each elected two people in whom they had confidence to ALT's board and then allowed them to perform their duties as duly elected directors. This conduct, entirely consistent with the investment relationship among the parties, cannot be sufficient to establish actual control.

To conclude otherwise, and to accept Beazer's theory, would effectively replace the actual control standard with the authority-to-control standard that we rejected in *Lansford–Coaldale*. Under Beazer's reasoning, operator liability would be imposed on any large shareholder that had the capacity to

influence a corporation's decisions, even in the absence of any evidence that the shareholder actually and substantially exercised this authority. We are bound by *Lansford–Coaldale* to reject this argument.[10]

We will affirm the district court's conclusion that Alcoa and CBI did not exert actual and substantial control over ALT's facilities and, thus, are not liable as "operators" of those facilities.

### IV. *LIABILITY OF BEAZER AS SUCCESSOR OWNER*

Finally, we must determine whether Beazer is liable, as ALT's successor, as an "owner" of ALT's facilities.[11] While we agree with the district court that Beazer is liable as ALT's successor, we reach this conclusion via a different path than the one travelled by the district court.

Generally, at common law, "when one company sells or transfers all its assets to another, the successor company does not embrace the liabilities of the predecessor simply because it succeeded to the predecessor's assets." *Philadelphia Electric Co. v. Hercules, Inc.,* 762 F.2d 303, 308 (3d Cir. 1985) (internal quotation marks omitted); *see also Elmer v. Tenneco Resins, Inc.,* 698 F.Supp. 535, 540 (D.Del.1988). However, there are four exceptions to this general rule of successor nonliability: (1) where the purchaser of assets expressly or impliedly assumes the liabilities of the transferor; (2) where the transaction amounts to a *de facto* merger; (3) where the purchasing corporation is merely a continuation of the transferor corporation; and (4) where the transaction is fraudulently intended to escape liability. *See Philadelphia Electric,* 762 F.2d at 308–09; *Elmer,* 698 F.Supp. at 540. Although CERCLA is silent on the matter of successor

liability, we have held that the same general rule of successor nonliability, and the same exceptions to that rule, apply in the CERCLA context. *See Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91–92 (3d Cir.1988); *see also B.F. Goodrich v. Betkoski,* 99 F.3d 505, 519 (2d Cir.1996), *clarified on denial of reh'g by* 112 F.3d 88 (2d Cir.1997).

The district court concluded that Beazer is liable as ALT's successor under the second of the four exceptions, believing that Beazer and ALT engaged in a *de facto* merger. We will not address the possible application of the *de facto* merger doctrine to this case because a more direct route to demonstrating Beazer's successor liability is apparent. Specifically, Beazer is liable under the first exception, since it assumed all of ALT's liabilities in June 1954.

An agreement entered into prior to the passage of CERCLA can allocate CERCLA liabilities. *Beazer East, Inc. v. Mead Corp.,* 34 F.3d 206, 211 (3d Cir.1994). To determine whether a pre-CERCLA provision covers CERCLA liabilities, "[w]e must look to see whether a[ ] [pre-CERCLA] provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims." *Id.* In undertaking this inquiry, we look to state law. *Id.* at 215.[12]

The April 1954 purchase agreement executed among Alcoa, CBI, and Beazer is silent on the matter of ALT's CERCLA liabilities. It contains no provision either specific enough to include CERCLA liability or broad enough to encompass all environmental liability. Therefore, the pre-CERCLA purchase agreement does not allocate ALT's

---

**10.** Beazer faults the district court for requiring, as prerequisites to a finding of operator liability, certain factors such as direct orders by Alcoa or CBI obeyed by ALT and evidence of divided loyalties of Alcoa- or CBI-appointed directors. However, a fair reading of the district court's opinion indicates that it appropriately assessed "the totality of the circumstances," *see Lansford–Coaldale,* 4 F.3d at 1222, and found insufficient evidence of actual control. *See, e.g.,* slip op. at 28.

**11.** Although we have determined that Alcoa and CBI are not liable as operators, it is still necessary to resolve whether Beazer is liable because this affects whether CBI can recover from Beazer for costs CBI has already incurred.

**12.** We do not understand the parties to be contending that our analysis would be any different regardless of whether we apply Delaware or Pennsylvania law.

CERCLA liabilities.[13] In the absence of any allocation, ALT's CERCLA liabilities remained exactly where they had been prior to execution of the purchase agreement: with ALT. *See Polius v. Clark Equipment Co.,* 802 F.2d 75, 77–78 (3d Cir.1986).

In June 1954, Beazer and ALT executed a liquidation agreement. That agreement contains the following provision:

> [Beazer], for itself, its successors and assigns, fully intending to become legally bound thereby, *does hereby assume all of the liabilities and obligations of [ALT] of whatsoever nature,* and does hereby agree to indemnify and hold harmless [ALT], its officers and directors, from and against all liability, loss, cost and damage in any way arising out of the said liquidation of ALT, including, without in any way limiting the generality of the foregoing, all liability, loss, cost and damage in any way arising out of the transfer of the property and assets of [ALT] pursuant to the provisions [of this liquidation agreement].

A5158 (emphasis added).

Beazer's assumption of "all of the liabilities and obligations of [ALT] whatsoever" is clear and unambiguous. Although the provision goes on to additionally provide indemnification for liabilities arising out of liquidation, the compound nature of the provision in no way detracts from the clarity of the assumption of liabilities language. Because this language is clear and unambiguous, we determine its meaning by looking to the language itself, without resort to extrinsic evidence. *See City Investing Co. Liquidating Trust v. Continental Casualty Co.,* 624 A.2d 1191, 1198 (Del.1993) (rejecting effort to introduce extrinsic evidence to aid interpretation of meaning of agreement phrase "any liabilities"); *East Crossroads Center, Inc. v. Mellon–Stuart Co.,* 416 Pa. 229, 205 A.2d 865, 866 (1965) (same).[14]

We conclude that this clear and unambiguous pre-CERCLA provision, whereby Beazer "assum[ed] all of the liabilities and obligations of [ALT] of whatsoever nature," is sufficiently broad to encompass assumption of CERCLA liabilities. *Cf. SmithKline Beecham Corp. v. Rohm and Haas Co.,* 89 F.3d 154, 159–60 (3d Cir.1996) (construing pre-CERCLA agreement, covering "[a]ll material liabilities . . . whether accrued, absolute, contingent or otherwise," to include CERCLA liabilities). Since, as we have explained, ALT's CERCLA liabilities remained with ALT even after the April 1954 purchase agreement, these liabilities were among "all of the liabilities and obligations of[ALT] of whatsoever nature" assumed by Beazer under the liquidity agreement.

**13.** Beazer's argument that the purchase agreement allocated these liabilities to Alcoa and CBI is unpersuasive. In the purchase agreement, Alcoa and CBI warranted that ALT's 1953 balance sheet "correctly sets forth the financial condition and net worth of[ALT] as of said date; that said balance sheet correctly sets forth all liabilities of [ALT] existing as of said date of whatsoever nature whether contingent or otherwise (including renegotiation), which sound accounting practice requires to be reflected thereon." A87. If ALT's actual liabilities exceeded those listed on its balance sheet, Alcoa and CBI agreed to "make proper adjustment with [Beazer] *on the closing date* either by reducing, on the basis of $34.50 per share, the number of shares of [Beazer stock] to be issued hereunder or otherwise." A90 (emphasis added). These provisions are not sufficiently general to allow us to conclude that Alcoa and CBI were making representations with respect to ALT's unknown and undiscoverable contingent environmental liabilities, including CERCLA. *See Beazer East,* 34 F.3d at 211. They provide only that the discovery of liabilities or assets that should have been listed on ALT's 1953 balance sheet would not void the deal but would instead obligate or allow Alcoa and CBI to adjust the terms of the deal prior to closing. Sound accounting practices, of course, did not require ALT's unknowable CERCLA liabilities to be listed on its 1953 balance sheet.

**14.** Thus, we reject Beazer's contention that, because its assumption of ALT's liabilities came in the course of ALT's dissolution, the scope of the assumption must be limited to those liabilities for which provision must be made in the winding up of the affairs of a dissolved Delaware corporation. The Supreme Court of Delaware rejected a very similar argument in *City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191 (Del.1993). There, as here, the liability assumption language was clear and unambiguous and unlimited by any reference to the Delaware dissolution statute. The court, accordingly, determined the intent from the face of the liability assumptions clause, as do we. We also note, however, that Beazer's purpose was not merely to dissolve ALT, but also to continue the operations of ALT's going business and to preserve its continuing relationships.

 

■ Beazer insists that, even if it assumed all of ALT's liabilities, including its CERCLA liabilities, those liabilities ceased to exist under Delaware law three years after ALT's dissolution. It thus concludes that whatever CERCLA liabilities Beazer assumed in the liquidation agreement expired in 1960.

■ We conclude that Beazer has misread the relevant Delaware law. It is, of course, true that a dissolved Delaware corporation ceases to exist three years after its dissolution and that a creditor cannot thereafter bring suit against it to enforce a corporate obligation. *See City Investing Co. Liquidating Trust v. Continental Cas. Co.,* 624 A.2d 1191, 1195 (Del.1993). This does not mean, however, that where a separate entity has received assets of a dissolved corporation and assumed its corporate liabilities, a creditor may not bring a suit to enforce that obligation against the continuing separate entity. The Supreme Court of Delaware so held in *City Investing,* 624 A.2d at 1191. The court there concluded that a creditor of a dissolved Delaware corporation could file a claim against a liquidating trust more than three years after the corporation's dissolution, where that liquidating trust had assumed the corporation's liabilities. Because the dissolving corporation had "opt[ed] to establish a separate legal entity to further its liquidation efforts," *id.* at 1196, and that entity "was in existence at the time [the corporation's] contingent liability . . . matured and at the time[the creditor] asserted its [ ]claim," *id.* at 1197, § 278 of Delaware's General Corporation Law did not bar suit against the liquidating trust.

If presented with our case, we believe the Delaware Supreme Court would allow Alcoa and CBI to press their claims against Beazer. Like the liquidity trust involved in *City Investing,* Beazer is an ongoing entity, with an existence separate from the dissolved corporation, which received corporate assets and assumed corporate obligations, and which existed both at the time Alcoa and CBI's CERCLA claims arose and at the time those parties asserted their claims. Though § 278 prevents ALT from being sued by Alcoa and CBI at this late date, since Beazer continues

to exist the corporate dissolution statute provides it no protection.

In sum, we hold that Beazer succeeded to ALT's CERCLA liabilities and is liable as "owner" of the wood treatment facilities.

## V. CONCLUSION

We conclude that Beazer is liable as ALT's successor and that Alcoa and CBI are not liable as operators. Therefore, we will affirm the judgment of the district court.