**BP AMOCO CHEMICAL COMPANY,**
Plaintiff,

v.

**SUN OIL COMPANY, FMC Corporation, and Claymont Investment Corporation, Defendants.**

No. 00–082–RRM.

United States District Court,
D. Delaware.

Sept. 17, 2001.

James J. Maron, Esquire, Thomas C. Martin, Esquire, and John P. Daniello, Esquire, Maron & Marvel, P.A., Wilmington, Delaware; counsel for plaintiff.

David J. Baldwin, Esquire, Potter Anderson & Corroon, LLP, Wilmington, Delaware; Harold L. Segall, Esquire and David M. Williamson, Esquire, Beveridge & Diamond, P.C., Washington D.C.; counsel for defendant Sunoco, Inc., successor to Sun Oil Company, and Claymont Investment Company.

Thomas S. Neuberger, Esquire, Wilmington, Delaware; counsel for defendant FMC Corporation.

## OPINION

McKELVIE, District Judge.

This lawsuit concerns the apportionment of environmental liabilities. Plaintiff, BP Amoco Chemical Company, is a Delaware corporation. Defendants, Sun Oil Company and FMC Corporation, are Delaware corporations. Defendant, Claymont Investment Corporation, at all times relevant to this action, was a wholly owned subsidiary of Sun.

On February 9, 2000, BP Amoco filed its complaint in this action against Sun, Claymont, and FMC alleging that defendants are jointly and severally liable for contribution and indemnification of costs it incurred in connection with the settlement of an environmental contamination suit with the United States Government. BP Amoco also seeks a judgment declaring defendants to be liable for contribution and indemnification of related costs that it may incur in the future.

In its complaint and amended complaint, BP Amoco sets forth a number of claims under which it asserts it is entitled to contribution or indemnification from the defendants. Specifically, BP Amoco seeks relief under the following legal theories: (i) contribution under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et. seq.; (ii) contribution under the Delaware Hazardous Substance Cleanup Act ("HSCA"), 7 Del. C. § 9105(a); (iii) contribution under the Delaware Uniform Contribution Among Tortfeasors Law ("UCATL"), 10 Del. C. § 6302; (iv) express indemnification or contribution under agreements between the parties; (v) negligence; and (vi) breach of contract.

On March 31, 2000, the defendants moved to dismiss the complaint. On October 6, 2000, BP Amoco amended its complaint. On October 27, 2000, Sun and Claymont moved to dismiss the amended complaint. On October 30, 2000, FMC renewed its motion to dismiss the complaint. This is the court's decision on the defendants' motions.

## I. *FACTUAL BACKGROUND*

The court draws the following facts from the BP Amoco's amended complaint.

In 1959, Sun and American Viscose Corporation formed AviSun Corporation. Each company owned fifty percent of the issued stock of AviSun. On January 20, 1963, Viscose sold all of its operating properties and assets, including its fifty percent stock interest in AviSun, to FMC. On August 5, 1963, Sun, Viscose, FMC, and AviSun agreed that FMC would undertake and assume all of Viscose's previous duties and obligations among and between these parties. On July 8, 1966, Sun entered into an agreement to purchase FMC's fifty percent stock interest in AviSun, on or before December 31, 1966. Thereafter, Sun's one hundred percent stock interest in AviSun was held by Sun's wholly owned subsidiary, Claymont.

During the period in which Sun and FMC owned AviSun stock, both Sun and FMC participated in the management and control over the operations of two AviSun plants, the polypropylene plant located in New Castle, Delaware and the film plant also located in New Castle, Delaware at Route 9. Sun obtained at least one of the plant's environmental permits for air and water discharges and made managerial decisions regarding both plants' compliance with pollution and environmental laws. Sun assumed a dominant role in the development and selection of all chemicals used in the polypropylene plant's production

and manufacturing processes. Sun employees were placed in charge of the polypropylene plant facility's day to day management and operations, including waste hauling and transportation and generation of alleged hazardous substances. In the spring of 1964, Sun and FMC assumed responsibility for both plants' materials and services procurement, which included obtaining raw materials for plant operations.

On October 18, 1967, Sun and Claymont entered into an agreement with BP Amoco and Standard Oil Company whereby Claymont sold its 100% stock interest in Avi-Sun to BP Amoco. The sale transaction was finalized on January 29, 1968. BP Amoco operated the New Castle, Delaware plants that had been previously operated by AviSun until October 1980.

BP Amoco alleges that FMC and Sun, while owners and operators of the AviSun plants, disposed of hazardous substances at the Delaware Sand and Gravel Superfund Site ("DS & G"), which is now a privately owned and operated landfill located in New Castle County, Delaware. These allegedly hazardous materials were found to be present at DS & G.

In 1990, BP Amoco was joined as a third party defendant in *United States v. Hercules, et al.*, C.A. No. 89–562–SLR (D. Del. Filed October 6, 1989), a civil action brought under Section 107(a) of CERCLA ("DS & G Litigation") seeking reimbursement of costs incurred by the United States Government in response to the release and threat of release of hazardous substances at DS & G. DS & G is a "facility" within the meaning of CERCLA § 101(9). 42 U.S.C. § 9601(9). In the DS & G Litigation the Government alleged that liquid, solid, and other hazardous substances were disposed of at DS & G from approximately 1957 though 1976. The government further alleged that the hazardous substances originated from the New Castle, Delaware polypropylene plant that was owned and operated by BP Amoco from 1968 until 1980, and that other hazardous substances were disposed of at DS & G from 1960 to 1968. The Government therefore contended that BP Amoco was liable under Section 107(a) of CERCLA for having allegedly owned, possessed, or arranged for the disposal or transport of hazardous substances at the DS & G site.

BP Amoco entered into a Consent Decree with the Government for the purpose of settling the DS & G Litigation. Under its terms, BP Amoco agreed to pay the Government a sum certain to reimburse them for response costs used to implement remedial measures at the DS & G site. BP Amoco paid the amount on or about March 30, 1995. The Consent Decree was entered in this court on June 14, 1995.

BP Amoco now seeks contribution and indemnification against the defendants for those response costs and a declaratory judgment against the defendants for BP Amoco's potential obligation to expend monies for response costs arising from AviSun plants that were allegedly contaminated from 1960 through 1968. In its amended complaint, BP Amoco alleges that it is entitled to contribution and indemnification from the defendants and seeks to establish duties arising from following sources: (i) the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. 9601 et. seq.; (ii) the Delaware Hazardous Substance Cleanup Act ("HSCA"), 7 Del. C. 9105(a); (iii) the Delaware Uniform Contribution Among Tortfeasors Law ("UCATL"), 10 Del. C. 6302; (iv) the express contractual obligation to indemnify or contribute; (v) negligence; and (vi) breach of contract. Sun, Claymont, and FMC have moved to dismiss BP Amoco's complaint asserting that the

BP Amoco has failed to state a claim upon which relief can be granted.

This is the court's decision on the defendants' motions to dismiss the complaint.

## II. DISCUSSION

### A. Standard of Decision

In considering a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept as true all of the allegations pled in the complaint and view the facts in the pleadings and all reasonable inferences therefrom in favor of BP Amoco, the non-moving party. *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir. 1991). The court may dismiss a complaint for failure to state a claim only when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. Does the Complaint State a Claim for Relief Under CERCLA and/or HSCA?

CERCLA was enacted by Congress in 1980 to address the environmental and health risks caused by pollution by imposing the costs of cleanup on those responsible for the contamination. Under Section 107(a)(2) of CERCLA, the United States may require payment for response costs associated with cleaning up industrial waste from "any person who at the time of disposal of any hazardous substance owned or operated any facility." *United States v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (quoting 42 U.S.C. §§ 9607(a) and 9607(a)(2)). Section 107(a)(3) of CERCLA further extends liability to any "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a

transporter for transport for disposal or treatment, of hazardous substances . . . ." 42 U.S.C. § 9607(a)(3).

The HSCA, Delaware's state law analogue of CERCLA that was passed in 1990, is generally modeled after CERCLA and also imposes liability on anyone who "owned or operated" a facility, anyone who arranged for the transport, disposal, or treatment of a hazardous substance at a facility, and anyone "responsible in any other manner for a release or imminent threat of release" of a hazardous substance at a facility. 7 Del. C. § 9105(a).

Both CERLCA and the HSCA have provisions that allow any responsible party to seek contribution for response costs from other parties who are liable under the statutes. *See* 42 U.S.C. § 9613(f)(1); 7 Del. C. § 9105(d). "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

BP Amoco alleges that Sun and FMC are statutory "operators" under CERCLA and the Delaware HSCA and are therefore jointly and severally liable for contribution for their share of the response costs paid by BP Amoco to settle the DS & G Litigation. BP Amoco asserts that Sun and FMC are directly liable as operators in two ways. First, BP Amoco argues that Sun is directly liable under CERCLA and HSCA as an operator of AviSun because it exerted direct control over all of AviSun's environmental activities at the New Castle, Delaware facilities. Second, BP Amoco argues that Sun, AviSun, Viscose, and FMC entered into a partnership at will whereby the partners directly operated the AviSun New Castle, Delaware facilities side by side with AviSun as joint venturers. BP Amoco contends that Sun and FMC were also CERCLA and HSCA "op-

erators" under this partnership at will and are therefore jointly and severally liable for their share of the response costs.

In opposition, Sun and FMC claim that they are shielded from liability due to their status as former shareholders in AviSun. They contend that as a matter of law they cannot bear such liabilities because they themselves did not dispose of any waste and because there is no basis to pierce the corporate veil. Moreover, defendants argue that no partnership at will existed among AviSun, Sun, Viscose, and FMC. Rather, they maintain that Sun, Viscose, and later FMC were at all times merely shareholders in AviSun.

■ According the Supreme Court in *Bestfoods,* a parent corporation can be liable as an *owner/operator* under CERCLA when its subsidiary owned or operated a CERCLA facility in only two circumstances: (1) the parent can be liable *directly,* as an "operator" of the facility if the parent corporation itself managed, directed, or controlled operations of the facility that were specifically related to pollution such as those concerning waste management or compliance with environmental regulations; (2) the parent can be liable *indirectly,* based on the subsidiary's status as a CERCLA "owner" or "operator," only if the corporate veil may be pierced between parent and subsidiary under traditional corporate law principles. *Bestfoods,* 524 U.S. at 55, 58, 118 S.Ct. 1876. Because BP Amoco has not set forth facts that demonstrate that it may be able to pierce the corporate veil, only the direct operator liability prong is at issue in this action.

The *Bestfoods* Court stressed that "CERCLA prevents [parent corporations] from hiding behind the corporate shield when, as 'operators,' they themselves actually participate in the wrongful conduct prohibited by the Act." *Id.* at 65–66, 118 S.Ct. 1876. More specifically, Justice

Souter, the author of the *Bestfoods* majority opinion, recognized that "a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture." *Id.* at 71, 118 S.Ct. 1876.

Seizing on this language, BP Amoco alleges that Sun is directly liable for its actual participation in and control over the environmental operations of the AviSun facilities both individually and together in a joint venture with its subsidiary, AviSun. BP Amoco alleges that FMC is directly liable for Viscose's participation in and control over the environmental operations of the AviSun facility by virtue of FMC's 1963 agreement to assume all the roles and responsibilities of Viscose with respect to the plants. BP Amoco further alleges that FMC is also liable by virtue of its participation in and control over the environmental operations of the AviSun facilities as a joint venturer with AviSun.

1. *Does the complaint state a claim upon which relief may be granted against Sun for its alleged direct operation of the AviSun facilities?*

BP Amoco sets forth a number of factual allegations in support of its claim that Sun is directly liable as an "operator" of the AviSun facilities. BP Amoco alleges that Sun managed, directed, and conducted operations at the New Castle plants specifically regarding environmental control. BP Amoco asserts that through its employee, Harold Elkin, "Sun became directly and inextricably involved in the environmental and regulatory matters of the AviSun facilities." Pl. Br. in Opp'n to Mot. to Dismiss by Def. Sun Oil Co. and Claymont Invest. Co. at 15. In support of this contention, BP Amoco notes that Sun's Coordinator of Pollution Abatement, Harold Elkin was made available to AviSun during the initial

phases of the AviSun polypropylene plant's start-up and operation to manage the plant's environmental compliance issues. Elkin was involved in the initial design of the plant's sewer system, drainage system, and waste water treatment systems, and advised, counseled, and guided plant personnel with respect to those systems. Moreover, Elkin was the primary individual responsible for obtaining environmental compliance permits for the plant and was the primary liaison to the State of Delaware Water Pollution Commission and Board of Health in obtaining Delaware air and water permits so the plant would be in compliance with environmental laws and regulations.

The facts BP Amoco alleges are similar to the facts of the *Bestfoods* case itself. In *Bestfoods*, after holding that a parent/stockholder who "manages, directs, or conducts..." a facility's "operations specifically related to pollution...[and]...decisions about compliance with environmental regulations..." becomes an "operator" of a facility subject to direct liability under CERCLA, the Court remanded the case to the district court on the basis that an employee of the parent company, "...became heavily involved in environmental issues..." of the facility in question. *Id.* at 72, 118 S.Ct. 1876 (citing *CPC Int'l. Inc. v. Aerojet–Gen. Corp.,* 777 F.Supp. 549, 561 (W.D.Mich.1991)). The Court noted that the employee played a key role in shaping the subsidiary facility's environmental compliance policy and concluded that, because he was an employee of the parent corporation, these actions were taken on behalf of the parent corporation and were sufficient to raise an issue of the parent corporation's operator liability. *Id.* at 59, 118 S.Ct. 1876.

■ Taking the facts and all reasonable inferences alleged by BP Amoco to be true, the court finds that BP Amoco has stated a claim for Sun's direct operator liability under CERCLA and the HSCA pursuant to the Supreme Court's holding in *Bestfoods.*

In remanding the *Bestfoods* case, the Supreme Court instructed the district court that in ultimately determining whether a parent corporation was acting within the normal parent-subsidiary relationship or whether a parent corporation's involvement surpassed that relationship and crossed the line into direct operation of the facility, it should look to "norms of corporate behavior" and ask "whether, in degree or detail, actions directed towards the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 71, 118 S.Ct. 1876. Thus, to prove its claim at trial, BP Amoco must prove that, despite the general presumption to the contrary in accepted norms of corporate behavior, those in charge of environmental policies and activities at AviSun were acting in their capacity as agents of Sun, and not as agents of AviSun, when they made environmental policy decisions and supervised waste management activities at the AviSun facility. If that were proven, Sun could be held directly liable for its own actions.

Sun additionally argues that BP Amoco has failed to plead that it paid more than its "pro rata share" of cleanup costs, as required by CERCLA and the HSCA. BP Amoco alleges that it has paid the United States Government to discharge liability for contamination from the AviSun facilities from 1960 through 1980 despite the fact that it did not own the AviSun facilities until 1968. The court finds that BP Amoco has set forth sufficient facts to support its allegation that it has paid more than their fair share of the cleanup expenses. Pursuant to CERLCA Section 133(f), Sun, if found liable, will have to contribute its pro rata share of the re-

sponse costs for the period from 1960 to 1968 during which Sun allegedly acted as an "operator."

Assessing the facts alleged in the procedural posture of a motion to dismiss, this court cannot find that BP Amoco fails to state a claim against Sun for direct liability as an operator under CERCLA and HSCA. Accordingly, Sun's motion to dismiss BP Amoco's Counts I, II, XVI, and XVII will be denied.

2. *Does the complaint state a claim upon which relief may be granted against FMC based on its own direct operation of the AviSun facilities or based on FMC's derivative liability for Viscose's alleged operation of the AviSun facilities?*

■ The Supreme Court's holding in *Bestfoods* makes clear that, unless the corporate veil can be pierced, a parent corporation that actively participated in, and exercised control over, the general operations of a subsidiary, without more, cannot be held liable under CERCLA as an operator of a polluting facility owned or operated by the subsidiary. *Id.* at 55, 66–67, 118 S.Ct. 1876; *see also North Shore Gas Co. v. Salomon, Inc.,* 152 F.3d 642, 648 (7th Cir.1998) (under *Bestfoods,* parent corporation incurs direct liability only if it manages, directs, or conducts the operations of the subsidiary's facility that are specifically related to pollution); *United States v. Township of Brighton,* 153 F.3d 307, 314 (6th Cir.1998) (same, quoting *Bestfoods* ). The Supreme Court noted that "[a]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." *Bestfoods,* 524 U.S. at 72, 118 S.Ct. 1876.

Thus in order to state a claim for operator liability under CERCLA or HSCA, BP Amoco must allege that FMC or Viscose itself managed, directed, or controlled operations of the facility that were specifically related to pollution. *Bestfoods,* 524 U.S. at 66–67, 118 S.Ct. 1876. It has not done so.

As FMC points out in its opposition papers, while there are myriad references to Sun's involvement with the environmental operations of the AviSun plant, BP Amoco's allegations regarding FMC's involvement are scant. The only allegations in BP Amoco's original complaint that refer to FMC's actions are in paragraphs 11 and 17.

Paragraph 11 states:
During the period in which Sun and FMC owned AviSun stock, both Sun and FMC participated directly in the management of the AviSun plant and exercised control over the AviSun plant's affairs and operations. Pl. Compl. at ¶ 11.

Paragraph 17 states:
In the spring of 1964, Sun and FMC assumed all purchasing operations for the plant and, in so doing, took over all responsibility for the AviSun plant's materials and services procurement. Through these plant purchasing operations, Sun expressly approved, ratified, confirmed, and continued existing waste disposal services arrangements at the AviSun plant. Pl. Compl. at ¶ 17.

In its amended complaint and supplemental response brief, BP Amoco alleges in addition that the FMC board of directors was made aware of activities at AviSun and authorized certain actions, including the involvement of AviSun in joint ventures; that FMC's board of directors stated that there was a general discussion of problems of AviSun and the need for unified operating control and management of the company; and that FMC took over the

medical operations from Sun with respect to the AviSun facilities and kept the plant medical records.

Similarly, there are minimal allegations regarding Viscose's involvement in the facilities, for which BP Amoco alleges FMC is derivatively liable. Regarding Viscose, BP Amoco alleges only that Viscose's control over AviSun activities included: extending Viscose's Welfare Plan to cover AviSun employees directly, selecting Avi-Sun trade names, establishing a joint laboratory facility, centralizing AviSun administrative officers at Viscose's plant in Marcus Hook, and guaranteeing bank notes.

■ Each of the facts concerning FMC and Viscose alleged in BP Amoco's complaint and amended complaint concern only the generalized involvement of FMC and its predecessor in interest, Viscose, with their subsidiary, AviSun. These allegations are inadequate to maintain a claim for direct operator liability under CERCLA and HSCA. *Bestfoods,* 524 U.S. at 72, 118 S.Ct. 1876. Accordingly, Counts VII, VIII, IX, X, and XIV of BP Amoco's amended complaint will be dismissed with respect to defendant, FMC.

3. *Does the complaint state a claim upon which relief may be granted against Sun and FMC for their alleged operation of the AviSun facilities as joint venturers?*

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation is not liable for the acts of its subsidiaries." *Bestfoods,* 524 U.S. at 61, 118 S.Ct. 1876 (citations omitted). In reconciling this fundamental corporate principle with the extent of liability of "owners" of facilities under CERCLA, the Supreme Court concluded in *Bestfoods* that the indirect "owner" liability set forth in CERCLA does not alter the difficult tests under the corporate

law that are necessary to disregard the corporate form. The Court held that a parent corporation may only be derivatively liable as an "owner" of a subsidiary if the corporate veil can be pierced. *Id.* at 64, 118 S.Ct. 1876.

BP Amoco does not argue that Sun and FMC are indirectly liable for AviSun's actions as the owners of AviSun. Rather, relying on language in *Bestfoods* stating that "a parent can be held directly liable when the parent operates the facility ... alongside the subsidiary in some sort of joint venture," BP Amoco argues that the defendants are directly liable under CERCLA and HSCA for their own actions as "operators" of AviSun facilities working alongside their subsidiary, AviSun, as joint venturers. *Id.* at 71, 118 S.Ct. 1876.

In support of its direct liability theory, BP Amoco argues that a joint venture it describes as a "partnership at will" was formed between Viscose, Sun, and AviSun whereby those three entities together operated the AviSun plants and their facilities in an effort to revitalize AviSun's poorly performing polypropylene plant. BP Amoco alleges that FMC is also liable as an operator under this partnership at will by virtue of its January 1963 acquisition of all of Viscose's assets ands its concurrent assumption of the obligations and liabilities of Viscose.

In their responses, Sun and FMC contend that the facts and the law belie the existence of any such legal relationship, and that BP Amoco conjured this partnership at will "out of thin air" in order to circumvent the difficult tests that are required to pierce the corporate veil and to hold a parent corporation liable for the conduct of its subsidiary. Defendants maintain that their only legal relationship with AviSun was that of shareholder, and that they should be protected from direct operator liability by virtue of their shareholder status.

■ Reviewing BP Amoco's allegations, the court finds no factual basis to conclude that relationship between the defendants and AviSun was anything but that of shareholders to a corporate subsidiary. Moreover, the numerous written agreements between the defendants, that are relied upon by BP Amoco as evidence of a "partnership," are stockholder and stock purchase agreements that clearly set forth the chosen legal relationship of the parties as incorporators and stockholders of Avi-Sun.

While *Bestfoods* expressly leaves room for a parent corporation to be directly liable as an operator under CERCLA by way of its participation in the facility along with its subsidiary as a joint venturer, adopting the expansive reading of joint venturers that is urged by BP Amoco would let this exception swallow the rule. If alleging the existence of an undocumented joint venture were sufficient to state a claim for direct operator liability of a parent corporation under CERCLA, the requirement that a plaintiff pierce the corporate veil to give rise to indirect liability of a parent corporation under CERCLA would be rendered useless.

■ Conclusory allegations that stockholders in a corporation, whose rights were governed by written stockholder agreements, operated as "partners at will" are not sufficient to establish direct operator liability under *Bestfoods*. Therefore, this court finds that BP Amoco's partnership at will allegations fail to state a claim upon which relief can be granted. Accordingly, Counts XI and XII of BP Amoco's amended complaint will be dismissed.

C. *Does the Complaint State a Claim for Relief under the Delaware Uniform Contribution Among Tortfeasors Law?*

BP Amoco next alleges that it is alternatively entitled to contribution from Sun under the UCATL, which states that "[t]he right of contribution exists among joint tort-feasors." 10 Del. C. § 6302(a). In response, Sun argues that BP Amoco's UCATL claim is deficient for two reasons. First, Sun argues that because BP Amoco has not alleged that it paid more than its pro rata share of the liability, it cannot meet the requirements of Section 6202(b) of Title 10. That section states that "[a] joint tort-feasor is not entitled to a money judgment for contribution until he or she has by payment discharged the common liability or has paid more than his or her pro rata share thereof." 10 Del. C. § 6302(b); *see New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F.Supp. 1180, 1190 (D.Del.1993). Second, Sun argues that because BP Amoco has admitted that Sun was not a party to the DS & G Litigation and therefore was not released from liability relating to the DS & G site through the Consent Decree, BP Amoco cannot meet the requirements of Section 6302(c) of the UCATL. That section states that "[a] joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement." 10 Del. C. § 6302(c).

To survive a motion to dismiss, BP Amoco may rely on inferences that can be drawn from its complaint as a whole. Sun alleges throughout its complaint and amended complaint that Sun is partially liable for the contamination that occurred at the AviSun plants. Moreover, Sun alleges that it discharged all of the AviSun liability in the DS & G Litigation settlement. Therefore, with respect to Sun's first argument, the court finds that, BP Amoco has alleged sufficient facts to show that it may establish at trial that it has discharged the entire common liability or

paid more than its pro rata share of that liability.

■ Sun's argument under Section 6302(c) of the Title 10, however, is dispositive. Section 6302(c) clearly states that "[a] joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement." 10 Del. C. § 6302(c). Because Sun was not alleged to be a party to the Consent Decree, its alleged liability to the United States has not been "extinguished by the settlement." Therefore, the court finds that BP Amoco cannot make out a claim for contribution under the UCATL. Accordingly, Count III of BP Amoco's complaint will be dismissed.

### D. *Does the Complaint State a Claim for Relief for Breach of Warranty?*

BP Amoco alleges it is entitled to contractual indemnification from Sun and Claymont based on their breach of two representations and warranties clauses in the 1967 Agreement under which BP Amoco purchased AviSun from Claymont and Sun.

The representations and warranties clauses upon which BP Amoco bases its contention are contained in . sections 3(g)(iii) and 3(j)(2), respectively, and state that:

● With the exception of certain liabilities disclosed in the Financial Statements and certain other attached schedules, "liabilities incurred by AviSun and by [AviSun's subsidiary] Patchogue subsequent to June 30, 1967 in the ordinary course of business, neither AviSun or Patchogue has any liabilities of any nature, whether absolute, accrued, contingent, or otherwise, and whether due or to become due." (hereinafter referred to as "the undisclosed liabilities clause")

● "Since June 30, 1967, there has not been … any damage, destruction, or loss (whether or not covered by insurance) materially or adversely affecting the property or business of AviSun or Patchogue or any item carried in the property account of AviSun or Patchogue at more than $50,000." (hereinafter referred to as "the material adverse change clause")

According to Sun and Claymont, the undisclosed liabilities clause is narrowly drawn and does not, as a matter of law, warrant against unknown future environmental liabilities. Sun and Claymont also contend that the material adverse change clause only warrants against liabilities that may have arisen between June 30, 1967 and the January 1968 closing date and does not warrant against any liabilities incurred after the closing date. Defendants also argue that even should the court find that the scope of the representations and warranties does extend to the environmental liabilities that are at issue, BP Amoco's breach of warranty claims must still be dismissed because they are barred by a three year statute of limitations that began running in January 1968 and expired in January 1971.

■ As a preliminary matter the court notes that although the clauses at issue were agreed upon before CERCLA and HSCA were passed, Third Circuit precedent establishes that, if sufficiently broad, pre-CERCLA indemnification clauses can require one party to indemnify another against CERCLA liability. *Beazer East, Inc. v. Mead Corp.*, 34 F.3d 206 (3d Cir. 1984). While it is possible for contractual clauses to cover such liability, to state a claim the plaintiff must establish that a sufficiently broad clause existed in the contract between the parties.

In *Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3d 551 (3d Cir.1997) ("*Al-*

*coa* "), the Third Circuit distinguished between a warranty clause similar to the undisclosed liabilities clause at issue here and an assumption clause that allocated future liabilities. The warranty clause in *Alcoa* stated that a balance sheet provided to the buyer, Beazer East, Inc., "correctly sets forth all liabilities of [the seller] . . . of whatsoever nature." *Alcoa*, 124 F.3d at 566 n. 13. The Third Circuit, based on the contract language itself, rejected the buyer's contention that this warranty allocated to the seller the risk of later-discovered CERCLA liability. *Id.* at 566. In contrast to its decision regarding the warranty clause, the court went on to hold that a subsequent provision under which Beazer East, Inc. agreed to "assume all of the liabilities and obligations . . . in any way arising out of" the transaction created a true assumption of CERCLA liability.

The Third Circuit has stated that the relevant inquiry in determining whether a clause covers future CERCLA liability is whether "an indemnification provision is either specific enough to include CERCLA liability or general enough to include any and all environmental liability which would, naturally, include subsequent CERCLA claims." *Beazer East, Inc.*, 34 F.3d at 211. The clauses that BP Amoco rely upon in this case are not specific enough to encompass CERCLA liability. Nor are the clauses general enough to include any and all environmental liability. Neither clause contains language that purports to cover future events and liabilities.

Moreover, the clauses neither refer to environmental indemnification nor do they state that defendants will assume liability for any future liabilities that may arise out of the transaction. An assumption clause may, depending on the specific terms of the clause, cause a party assume the responsibility for certain liabilities, including those arising in the future. However, representations and warranties clauses, such as those at issue in this case, are used for the limited purpose of assisting the buyer in assessing the transaction. Such clauses merely serve as assurance that the seller has not failed to disclose known defects or undesirable liabilities that would impact the sale price.

In support of its claim, BP Amoco relies on a number of factually inapposite cases that construed either indemnity or warranty provisions that were far broader than the clauses at issue in this case or assumption of liability clauses which do not appear in the 1967 Agreement. *See, e.g. Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 12–13 (2d Cir.1993)[1]; *Kerr–McGee Chem. Corp.*, 14 F.3d 321, 326–27 (7th Cir.1994).[2]

The court finds that the undisclosed liabilities clause and the material adverse change clause in the October 1967 agreement are warranty clauses, the scope of which is limited to "liabilities" existing at the closing date. A careful reading of the clauses reveals that the purpose of the clauses was to shift the risk of undisclosed liabilities or material adverse changes that

1. Buyer "assumes and agrees to be responsible for an to pay, perform, discharge and indemnify [seller] against, all liabilities (absolute or contingent), obligations, and indebtedness of [the seller] related to the Aluminum Assets . . . as they exist on the Effective Time or arise thereafter with respect to actions or failures to act occurring prior to the Effective Time." *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 12–13 (2d Cir.1993).

2. Purchaser "expressly agrees to indemnify and to defend and hold [plaintiff's predecessor]...free and harmless from and against any and all claims . . . arising out of or resulting from, directly or indirectly . . . the maintenance of any action, claim, or order concerning pollution or nuisance." *Kerr–McGee Chem. Corp.*, 14 F.3d 321, 326–27 (7th Cir. 1994).

arose during the period from June 30, 1967 to the closing date from the buyer, BP Amoco, to the sellers, Sun and Claymont. Their scope was not meant to include indemnification for future environmental liabilities. Accordingly, such clauses cannot be the basis of CERCLA or HSCA indemnification in this case. Therefore, Counts IV, V, and VI of BP Amoco's amended complaint will be dismissed. Because the court finds that BP Amoco fails to state a substantive claim for breach of warranty, it is unnecessary to address the defendants' alternative argument that the claim is barred by the statute of limitations.

E. *Does the Complaint State a Claim for Relief for Negligent Provision of Services?*

BP Amoco next alleges that Sun and FMC voluntarily rendered environmental services to AviSun and negligently failed to provide those services in a reasonable manner. BP Amoco argues that, as successor to AviSun, it has suffered injury from the defendants' purported negligence when it paid response costs for the environmental damage emanating from the AviSun plant at the DS & G site and is exposed to similar potential liability from environmental damage at other plant sites in Delaware. BP Amoco further alleges that the defendants knew of the dangers and hazards of environmental contamination at the New Castle, Delaware AviSun plants, that because of their beneficial ownership and right to control and manage AviSun the defendants were in a position to correct such deficiencies at the plants, and that Sun and FMC nonetheless failed to correct such deficiencies. In response, defendants argue that BP Amoco fails to state a claim for negligent provision of services because the only alleged injury to the plaintiff is monetary.

■ Under Delaware law, for a plaintiff to state a claim for negligent provision of services that plaintiff must be physically harmed. *See* Restatement (Second) of Torts § 323 (1965) (recognizing physical harm as element of claim); *Patton v. Simone,* 626 A.2d 844, 849 (Del.Super.Ct.1992) (same); *see also First State Bank of Hudson County v. United States,* 599 F.2d 558, 565 n. 7 (3d Cir.1979) (stating in dicta that application of tort to monetary loss would require unprecedented extension of doctrine).

■ BP Amoco alleges only a monetary loss and does not allege any physical injury. Because BP Amoco's negligence claim is missing this element, it cannot state a claim for relief for negligent provision of services. BP Amoco's claim sounds not in negligence but in contribution for monetary payments that it has made or will make in connection with waste disposal sites. Accordingly, Count XIII of BP Amoco's amended complaint will be dismissed.

F. *Does the Complaint State a Claim for Relief for Breach of Contract?*

BP Amoco also alleges that Sun and FMC breached a Voluntary Cleanup Agreement with the State of Delaware Department of National Resources and Environmental Control ("DNREC") by refusing to pay for their agreed upon share of the costs incurred during DNREC's Remedial Investigation/Feasibility Study ("RI/FS") of the former AviSun plants sites and other related sites. BP Amoco alleges that under the Cleanup Agreement, BP Amoco, Sun, and FMC agreed with DNREC to share the costs of the RI/FS, with BP Amoco contributing two-thirds and Sun and FMC jointly contributing one-third of the costs. BP Amoco alleges that it paid for all costs associated with the RI/FS of the AviSun plants site and other related sites. BP Amoco states that when it requested reimbursement from Sun and

FMC in accordance with the Cleanup Agreement, the defendants refused to pay for their share of the costs.

Sun and FMC argue that BP Amoco fails to state a claim for breach of contract. First, they argue that BP Amoco merely alleged that a contract existed between the defendants and the State, but failed to allege that any contractual obligation runs from the defendants to BP Amoco. Second, defendants argue that BP Amoco's breach of contract claim is fatally deficient because BP Amoco admits that the agreement was merely "voluntary" and failed to plead that the agreement was supported with consideration.

██ The court agrees with the defendants that BP Amoco has failed to allege any contractual obligation between BP Amoco and the defendants. Rather, BP Amoco has alleged only that a contract exists between defendants and the State. Without reaching the consideration issue, it is apparent that, based on its allegations, BP Amoco is without standing to assert a claim for breach of this contract against the defendants. Therefore, Count XV of BP Amoco's amended complaint will dismissed.

### G. Are Plaintiff's Claims for Declaratory Relief Ripe?

As part of BP Amoco's amended complaint, BP Amoco seeks a declaratory judgment on defendant's CERCLA and HSCA liability for future response costs relating to the AviSun sites that may be incurred by BP Amoco. Defendants contend that to recover under Section 107(a)(4) of CERCLA a plaintiff must have actually incurred response costs. 42 U.S.C. § 9607(a)(4). Defendants, therefore, argue that because BP Amoco has stated that it has not yet incurred response costs at sites other than DS & G, the claims for declaratory relief as to all future response costs should be dismissed as unripe.

Section 113(g)(2) of CERCLA expressly authorizes courts to grant declaratory relief for future response costs that are incurred in the cleanup of a site. It states:

In any [action for recovery of the costs referred to in section 107]... the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. 42 U.S.C. § 9613(g)(2).

As the Ninth Circuit explained in *Dant & Russell, Inc. v. Burlington Northern Railroad (In re Dant & Russell, Inc.)*, 951 F.2d 246, 249–50 (9th Cir.1991), sections 107 and 113 "envision that, before suing, CERCLA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job."

BP Amoco alleges in its amended complaint that it entered into a Consent Decree with the Government to settle the DS & G Litigation and that "the amount paid by BP Amoco for response costs represented all of AviSun's liability for the period of 1960 through 1976 as to the DS & G site." Pl.'s Am. Compl. at ¶ 31. BP Amoco further alleges that DNREC "has alleged that from 1960 through 1980 AviSun and its successors generated and disposed of hazardous waste at other sites in Delaware, and has notified BP Amoco Chemical Company, Sun, and FMC of their potential liability relative to these sites." Pl.'s Am. Compl. at ¶ 29. In numerous places, BP Amoco's amended complaint asks this court to "declare the rights and legal obligations of the parties with respect to environmental liabilities arising from the AviSun plants."

According to its allegations, BP Amoco has not yet had been found to be a responsible party for contamination sites in Delaware other than the DS & G site. As a result, BP Amoco has not yet paid response costs for any site other than the DS & G site. Therefore, the court finds that BP Amoco's declaratory judgment claims seeking CERCLA and HSCA contribution for sites other then the DS & G site are premature. Accordingly, Counts IX and X of BP Amoco's amended complaint will be dismissed.

## III. SUMMARY

The defendants' motions to dismiss will be granted with respect to Counts III through XV of BP Amoco's Amended Complaint. Accordingly, defendants, FMC and Claymont will be dismissed from this action. Sun's motion to dismiss is denied with respect to Counts I, II, XVI, and XVII of BP Amoco's Amended Complaint.

The court will enter an order in accordance with this opinion.