**BP AMOCO CHEMICAL COMPANY,
Plaintiff,**

v.

**SUN OIL COMPANY, et
al., Defendants.**

**No. CIV.A.00–82–KAJ.**

United States District Court,
D. Delaware.

May 5, 2004.

James J. Maron, Esq. and Timothy J. Wilson, Esq., Maron & Marvel, P.A., Wilmington, DE, for plaintiff.

Thomas P. Preston, Esq. and Steven L. Caponi, Esq., Blank Rome LLP, Wilmington, DE, for defendant Sunoco, Inc. (R & M), successor to Sun Oil Company, of counsel: Harold L. Segall, Esq., David M. Williamson, Esq., and James T. Esselman, Esq., Beveridge & Diamond, P.C., Washington, D.C.

## MEMORANDUM OPINION

JORDAN, District Judge.

### I. INTRODUCTION

This case involves the apportionment of environmental liabilities, arising under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 *et seq.,* and the Delaware Hazardous Substance Cleanup Act ("HSCA"), 7 Del. C. § 9601 *et seq.* Presently before me are a Motion to Quash Richard Zielinski's Subpoena (Docket Item ["D.I."] 164), a Motion to Exclude the Expert Testimony of Ben C. Ball, Jr. (D.I.178), and a Motion for Summary Judgment, or alternatively, for Partial Summary Judgment (D.I. 181; "BP Amoco's Motion"), filed by plaintiff BP Amoco Chemical Company ("BP Amoco"). Also before me is a Motion for Summary Judgment filed by defendant Sun Oil Company ("Sun"). (D.I. 172; "Sun's Motion".) For the reasons that follow, Sun's Motion will be granted, BP Amoco's Motion will be denied, and the remaining motions will be denied as moot.

### II. BACKGROUND

Because the factual and procedural history of this case is set forth in two prior opinions of the court, *see BP Amoco Chem. Co. v. Sun Oil Co., et al.,* 166 F.Supp.2d 984 (D.Del.2001) (granting in part and denying in part defendants' motions to dismiss) (*BP Amoco I*); *BP Amoco Chem. Co. v. Sun Oil Co., et al.,* 200 F.Supp.2d

429 (D.Del.2002) (granting in part and denying in part plaintiff's motion for reconsideration) (*BP Amoco II*), it will not be repeated herein. Rather, the facts pertinent to the instant motions are incorporated, as appropriate, in the discussion below.

## III. STANDARD OF REVIEW

Summary judgment will be granted when "there is no genuine issue as to any material fact and...the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2004); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. A factual issue is genuine if it can reasonably be resolved in favor of either party. *Id.* at 250, 106 S.Ct. 2505. A fact is material if it can affect the outcome of the action based on the governing law. *Id.* at 248, 106 S.Ct. 2505.

The party seeking summary judgment must demonstrate the absence of genuine issues of material fact, and then the nonmoving party must set forth facts proving that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–

24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "[I]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* (citations omitted).

## IV. DISCUSSION

The parties agree that one issue to be decided on summary judgment is whether Sun is liable as an "operator" of AviSun's New Castle Facility [1] under CERCLA, 42 U.S.C. § 9607(a), or the HSCA, 7 Del. C. § 9105(a).[2] (D.I. 173 at 2; D.I. 185 at 5.) Sun argues that it has no operator liability because it did not supervise or control waste disposal at the AviSun New Castle Facility. (D.I. 173 at 18.) BP Amoco argues that one of Sun's employees, Harold Elkin, managed, controlled, and directed environmental issues at the AviSun New Castle Facility, such that operator liability should attach to Sun. (D.I. 185 at 5, 11.)

Sun further argues that it should not be held liable as an "arranger" under CERCLA, 42 U.S.C. § 9607(a)(3), or the HSCA, 7 Del. C. § 9105(a)(2), because there is no evidence that Sun owned or possessed any waste generated by the AviSun New Castle Facility. (D.I. 173 at 16.) BP Amoco

---

1. AviSun began operating a Film Plant in September 1959 and a Polypropylene (Polymer) Plant on September 4, 1961. The plants will be referred to collectively as the New Castle Facility. (D.I. 214 at 3, 4.)

2. Sun also argues that it is not liable as an "owner" under CERCLA or the HSCA. (D.I. 173 at 16.) BP Amoco concedes that Sun is not an owner of the AviSun film plant for purposes of liability under CERCLA and HSCA. (D.I. 190 at 2 n. 2.)

responds that Sun arranged for the disposal of waste at the AviSun New Castle Facility through two of its employees, John Harron and Robert Abbe. (D.I. 190 at 26.) Sun says that BP Amoco's evidence regarding Mr. Harron's and Mr. Abbe's activities fails to prove that Sun owned or possessed any waste, as is required to impose arranger liability under *Morton Int'l, Inc. v. A.E. Staley Mfg. Co.,* 343 F.3d 669, 677 (3d Cir.2003).

## A. CERCLA and the HSCA Generally

CERCLA was enacted by Congress in 1980 to address the environmental and health risks caused by pollution. The statute imposes the costs of cleanup on those responsible for environmental contamination. *BP Amoco I,* 166 F.Supp.2d at 989. Under Section 107(a)(2) of CERCLA, the United States may require payment for response costs associated with cleaning up industrial waste from "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 U.S.C. § 9607(a)(2); *see also U.S. v. Bestfoods,* 524 U.S. 51, 55, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Section 107(a)(3) of CERCLA further extends liability to "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances...." 42 U.S.C. § 9607(a)(3).

The HSCA, passed in 1990, is the Delaware state law analogue of CERCLA. *BP Amoco I,* 166 F.Supp.2d at 989. Like CERCLA, the HSCA also imposes liability on anyone who "owned or operated" a facility, anyone who arranged for the transport, disposal, or treatment of a hazardous substance at a facility, and anyone "responsible in any other manner for a release or imminent threat of release" of a hazardous substance at a facility. 7 Del. C. § 9105(a).

Both CERCLA and the HSCA have provisions that allow any responsible party to seek contribution for response costs from other parties who are liable under the statutes. *See* 42 U.S.C. § 9613(f)(1); 7 Del. C. § 9105(d). "In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). In this case, BP Amoco alleges that Sun is a statutory "operator" and "arranger" under CERCLA and the HSCA and is therefore jointly and severally liable for contribution for its share of the response costs paid by BP Amoco to settle an environmental contamination suit with the United States government.[3] *BP Amoco I,* 166 F.Supp.2d at 989.

## B. Operator Liability [4]

■ An "operator" is "any person...operating" the relevant facility. 42 U.S.C.

**3.** BP Amoco initially filed this lawsuit against defendants Sun, FMC Corporation ("FMC"), and Claymont Investment Corporation ("Claymont"), seeking contribution for response costs that BP Amoco incurred after settling with the United States government a CERCLA case pertaining to the DS & G Superfund Site (the "DS & G Litigation"). *BP Amoco I,* 166 F.Supp.2d at 988. BP Amoco's claims against Claymont were dismissed in *BP Amoco I* on September 17, 2001. FMC subsequently settled with BP Amoco and was dismissed from the case on October 24, 2003. (D.I.160.) Thus, Sun is the only remaining defendant.

**4.** Because the HSCA is analogous to CERCLA, any conclusions reached under a CERCLA analysis pertaining to operator and arranger liability will also be reached under the HSCA. *See BP Amoco I,* 166 F.Supp.2d at 992; *BP Amoco II,* 200 F.Supp.2d at 433 n. 3.

§ 9601(20)(A)(iii). "Under CERCLA, an operator is simply someone who directs the working of, manages, or conducts the affairs of a facility." *U.S. v. Bestfoods*, 524 U.S. 51, 66–67, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). CERCLA operator liability, however, requires that the operator's control over the facility relate to pollution control or waste disposal. *Id.; see also Consolidated Edison Co. Of New York, Inc. v. UGI Utilities, Inc.*, 310 F.Supp.2d 592, 603 (S.D.N.Y.2004). "To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 524 U.S. at 66–67, 118 S.Ct. 1876.

The parties agree that, from 1959 to 1966, Sun owned 50% of the shares in AviSun Corporation ("AviSun"), and that Sun was the 100% shareholder of AviSun from December 21, 1966 to January 29, 1968. (D.I. 214 at 5.)[5] The parties therefore acknowledge that a parent-subsidiary relationship existed between Sun and AviSun from 1959 to 1968. (D.I. 173 at 19; D.I. 185 at 4.) AviSun began operating the Film Plant at the New Castle Facility in September 1959 and began operating the Polypropylene (Polymer) Plant there on September 4, 1961. (D.I. 214 at 3, 4.) BP Amoco argues that Sun is liable under CERCLA as an operator of AviSun's New Castle Facility. (D.I. 185 at 4.)

In *Bestfoods*, the Supreme Court contemplated three scenarios in which a parent corporation may be held directly liable as an operator "for its own actions in operating a facility owned by its subsidiary." *Id.* at 64, 118 S.Ct. 1876. First, a parent might be held directly liable when "the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture." *Id.* at 71, 118 S.Ct. 1876. Second, direct liability might arise when "a dual officer or director...departs so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility." *Id.* Third, the Court contemplated direct liability when "an agent of the parent with no hat to wear but the parent's hat...manages or directs activities at the facility." *Id.* at 71, 118 S.Ct. 1876.

BP Amoco argues that Sun is liable as an operator of the New Castle Facility under the third theory of direct liability set forth in *Bestfoods*. (D.I. 185 at 5.) Specifically, BP Amoco argues that Harold Elkin, a Sun employee from 1948 to 1989 (D.I. 214 at 3), directed, managed and conducted activities at the New Castle Facility (D.I. 185 at 18). Sun argues that BP Amoco has not come forward with evidence sufficient to prove that Mr. Elkin "made environmental policy decisions and supervised waste management activities at the AviSun [New Castle] [F]acility." (D.I. 202 at 8 (citing *BP Amoco I*, 166 F.Supp.2d at 991.))

The Supreme Court provides the following guidance in *Bestfoods* for determining whether an agent of the parent corporation "with no hat to wear but the parent's hat," 524 U.S. at 71, 118 S.Ct. 1876, managed or directed activities at a subsidiary, thus subjecting the parent to operator liability under CERCLA:

---

**5.** D.I. 214 is the Proposed Joint Pretrial Order filed by the parties on May 3, 2004. The uncontroverted facts recited therein are dispersed throughout the parties' summary judgment briefing, however, for ease of reference, the undisputed facts that are contained in the Pretrial Order are cited herein.

The acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Activities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability. *The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.*

*Id.* at 71–72, 118 S.Ct. 1876 (internal quotation and citation omitted) (emphasis added). It is undisputed that, at all times relevant to the instant case, Mr. Elkin was a Sun employee and that he was never an employee of AviSun. (D.I. 214 at 3.) Therefore, under *Bestfoods*, Mr. Elkin is an agent of Sun "with no hat to wear but the parent's hat." 524 U.S. at 71, 118 S.Ct. 1876.

BP Amoco asserts that, in order to find that Sun was an operator due to Mr. Elkin's activities, I must define, as a matter of law, what activities constitute "directing," "managing," or "conducting" operations relating to pollution at the New Castle Facility. (D.I. 185 at 5.) However, Sun argues that BP Amoco has not met its burden of proving that Mr. Elkin's behavior departed from corporate norms as required under *Bestfoods*. (D.I. 173 at 36–39; D.I. 202 at 22–24.) BP Amoco responds that "[a]n analysis of whether the activities of Sun and its employees were 'eccentric' as compared to corporate norms is not relevant to this case." (D.I. 190 at 10.)

■ BP Amoco's argument is not persuasive, while Sun's is. First, BP Amoco cites no authority, and I am aware of none, that supports its novel position urging me to define "directing," "managing," and "conducting" as a matter of law and then determine whether Mr. Elkin's actions meet those definitions. (D.I. 185 at 16–17, D.I. 190 at 11.) Second, as articulated in *Bestfoods*, whether Mr. Elkin's activities with respect to the New Castle Facility were "eccentric under accepted norms of parental oversight of a subsidiary's facility" is, contrary to BP Amoco's assertions, highly relevant here. 524 U.S. at 72, 118 S.Ct. 1876. It is, in fact, "the critical question" to be considered. *Id.; see also BP Amoco I*, 166 F.Supp.2d at 991; *Schiavone v. Pearce*, 77 F.Supp.2d 284, 290 (D.Conn.1999). BP Amoco has not come forward with any evidence to prove that Mr. Elkin's activities were unusual, let alone eccentric, under accepted norms of parental oversight of a subsidiary's facility (*see* D.I. 190 at 10), and for this reason, BP Amoco's Motion will be denied and Sun's Motion will be granted to the extent that it seeks summary judgment that Sun is not liable as an operator under CERCLA and the HSCA due to Mr. Elkin's activities.[6]

---

6. In its Answering Brief to Sun's Motion for Summary Judgment, BP Amoco asserted, for the first time, that the activities of another Sun employee, Dr. Charles Brooks, with respect to AviSun subjected to Sun to operator liability under the third category of direct liability articulated in *Bestfoods*. (D.I. 190 at 3, 10.) However, as with Mr. Elkin (*see infra* at pp. 171–172), BP Amoco has not set forth any evidence that Dr. Brooks' actions were eccentric under accepted norms of parental oversight of a subsidiary's facility, and summary judgment for BP Amoco must be denied. Sun's Motion will be granted to the extent that it seeks summary judgment that it

*See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.") (citation omitted).

### C. Arranger Liability

As noted *supra,* CERCLA also imposes liability on any person who arranged for the disposal of hazardous substances. *See* 42 U.S.C. § 9607(a)(3); *Morton Int'l,* 343 F.3d at 678; *see also* 7 Del. C. §§ 9105(a)(2) and (a)(3) (analogous HSCA provisions). The most important factors in determining "arranger liability" are:

> (1) ownership or possession; and (2) knowledge; or (3) control. Ownership or possession of the hazardous substance must be demonstrated, but this factor alone will not suffice to establish liability. A plaintiff must also demonstrate whether control over the process that results in a release of hazardous waste *or* knowledge that such release will occur during the process.

*Morton Int'l,* 343 F.3d at 677–78 (emphasis in original, footnote omitted). Therefore, a defendant cannot be held liable as an arranger under CERCLA unless the plaintiff comes forward with evidence demonstrating ownership or possession of the hazardous substance by the defendant. *Id.* at 677.

■ Sun argues that there is no evidence that it ever owned or possessed any waste generated by the New Caste Facility. (D.I. 173 at 17.) In response, BP Amoco points to interoffice correspondence from John Harron, a Sun employee "on loan" to AviSun for one year, to Ray Watrous, dated February 28, 1963, instructing Mr. Watrous to install an incinerator at the New Castle Facility and "conduct a study to determine the volume of waste to be handled by the incinerator and the present cost of such disposal." (D.I. 190 at 24.) BP Amoco also asserts that Robert Abbe, another Sun employee, hired John Weaver to dispose of waste from the New Castle Facility. (*Id.* at 26.) This evidence, says BP Amoco, shows that Sun (or Sun's agents) "controlled the process by which the waste from the [New Castle] Facility was disposed." (*Id.*) However, control alone is not enough to impose arranger liability under Third Circuit law. *See Morton Int'l,* 343 F.3d at 677–78. Rather, BP Amoco must first come forward with evidence to prove that Sun owned or possessed the waste at issue, *id.,* and it has failed to do so. Sun's Motion will be granted to the extent that it seeks summary judgment that it is not liable as an arranger under CERCLA or the HSCA.[7]

---

is not liable as an operator under CERCLA or the HSCA due to Dr. Brooks' activities.

7. BP Amoco also alleges that Sun arranged for waste from the New Castle Facility to be disposed at DS & G prior to 1968 (D.I. 31 at ¶¶ 132, 142), and thus BP Amoco is seeking contribution for costs it paid as part of a Consent Decree pertaining to the DS & G landfill (D.I. 190 at 25). *See* 42 U.S.C. § 9607(a)(3); 7 Del. C. §§ 9105(a)(3) and (a)(4). BP Amoco's evidence to support this claim is that, in a deposition taken in connection with a different lawsuit, the owner of DS & G, Vincent Dell'Aversano, testified that he sealed the bottom of the DS & G landfill with atactic (a polypropylene waste product produced at the AviSun Polymer Plant) from the New Castle Facility before receiving other wastes. (D.I. 190 at 25.) From this testimony, BP Amoco draws the reasonable inference that, because the DS & G landfill began operating in 1961, and Mr. Dell'Aversano lined the DS & G landfill with atactic before receiving other wastes, then the atactic from the New Castle facility was used to line the DS & G

## D. Sun's Remaining Arguments

Finally, Sun argues that BP Amoco's allegations that Sun is liable based on certain activities undertaken by Sun employees *vis à vis* the AviSun film plant are unsupported by the evidence. (D.I. 173 at 25–39.) These activities include Sun employees participating in the design of the AviSun film plant (*id.* at 26); Mr. Elkin's rendering advice to AviSun (*id.* at 28); lending Mr. Harron to AviSun from March 1962 through March 1963 (*id.* at 32); and AviSun's outsourcing its purchasing paperwork to Sun beginning in 1964 (*id.* at 34). BP Amoco responds that Mr. Elkin directed how environmental matters were handled at the AviSun film plant (D.I. 190 at 15), and that material issues of fact exist regarding Mr. Harron's actions at the Avi-Sun film plant with respect to waste disposal and environmental issues, potentially giving rise to operator liability (*id.* at 23–24). Sun points to the undisputed facts to prove that Mr. Elkin did not direct or control waste disposal operations at Avi-Sun. (D.I. 202 at 8.) Sun also says that Mr. Harron did not make any waste disposal decisions while he was there. (*Id.* at 17–18.)

In its answering brief (D.I.190), BP Amoco did not address Sun's arguments regarding design of the AviSun plant and AviSun's outsourcing its purchasing paperwork to Sun. Therefore, summary judgment on these points will be granted in favor of Sun. Sun's remaining arguments

regarding Mr. Elkin and Mr. Harron and BP Amoco's responses merely repeat the parties' positions on Sun's operator liability, and, as discussed *supra*, summary judgment will be granted to Sun on those points.

## V. CONCLUSION

For these reasons, Sun's Motion (D.I. 172) will be granted in its entirety and BP Amoco's Motion (D.I.181) will be denied. BP Amoco's motions to quash Mr. Zielinski's subpoena (D.I.164) and to exclude expert testimony (D.I.178) will be denied as moot. An appropriate order will issue.

### *ORDER*

For the reasons set forth in the Memorandum Opinion issued today, it is hereby ORDERED that Sun's Motion for Summary Judgment (D.I.172) is GRANTED; BP Amoco's Motion for Summary Judgment (D.I.181) is DENIED; and BP Amoco's Motion to Quash Mr. Zielinski's Subpoena (D.I.164) and Motion to Exclude Mr. Ball's Expert Testimony (D.I.178) are DENIED as moot.

---

landfill prior to 1968. (D.I. 190 at 26.) Even accepting that inference as true, however, there is still no evidence that Sun arranged for, controlled, or even knew about Mr. Dell'Aversano's using the atactic from the New Castle facility to seal the DS & G landfill prior to 1968. *See Morton Int'l,* 343 F.3d at 677–78. Thus, BP Amoco has not come forward with any competent evidence to prove that Sun arranged for the disposal of waste at DS & G; generated, disposed of, or treated waste at DS & G; or that Sun is responsible

for the release or threatened release of a hazardous substance at DS & G. *See* 42 U.S.C. §§ 9607(a)(3); 7 Del. C. §§ 9105(a)(4) and (a)(6). Summary judgment for Sun will therefore be granted with respect to these claims. I also note that, in Count II of its Amended Complaint (D.I.31), BP Amoco alleges that, under the HSCA, Sun is liable for contribution at several sites in Delaware apart from DS & G; however, BP Amoco only discusses the DS & G landfill in its summary judgment briefing.